```
                    United States District Court
                      District of Massachusetts
```

```
_____
                            )
UNITED STATES OF AMERICA,   )
                            )
        v.                  )
                            )     Criminal No.
FELIX SERRANO, ARNALDO CASTRO,  ) 08-10298-DPW
JOSE M. MARRERO and CARLOS URDAY )
                            )
        Defendants.         )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

The defendants in this case are charged with one count of conspiracy to possess with intent to distribute, and conspiracy to distribute, cocaine and heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. One of the defendants, subsequently joined by two co-defendants, has moved to suppress evidence obtained through electronic monitoring (and evidence derivative of such monitoring) on the grounds that the subject wiretap warrant was not supported by probable cause and did not contain a full and complete statement of necessity. The motions were referred to this session because United States District Judge Douglas P. Woodlock, who is presiding over all other aspects of this case, approved the wiretap warrants at issue.

## I. **Background**

### A. **Factual Background**

In connection with a suspected drug distribution conspiracy, law enforcement officials sought and obtained warrants to conduct electronic monitoring of various telephone numbers. The defendant Felix Serrano ("Serrano"), also known as "Tato," challenges the warrants which authorized the monitoring of two of those telephone numbers, 207-423-9055 ("Target Telephone #2") and 203-278-9108 ("Target Telephone #3"). Those warrants were both obtained based, in part, on information collected during the monitoring of a third telephone number, 508-345-3397 ("Target Telephone #1"), used by Serrano's co-defendant, Carlos Urday ("Urday").

#### 1. **Target Telephone #1**

On May 27, 2008, Special Agent Joseph Tamuleviz ("Tamuleviz") of the United States Drug Enforcement Agency ("the DEA") applied for and received authorization to electronically monitor Target Telephone #1, a cellular phone used by the defendant Urday. At the time of that application, Tamuleviz had 17 years of experience as a DEA special agent and had participated in over 100 narcotics investigations. By virtue of his training and experience he was aware that drug traffickers commonly use cellular phones and speak in coded language.

The DEA began investigating Urday in April, 2007, after

learning from a confidential informant that he was distributing cocaine from his auto body shop in Brockton, Massachusetts. Tamuleviz's affidavit in support of the wiretap application presented information acquired from two confidential informants, through physical surveillance and through controlled buys with law enforcement.  The affidavit also stated that Urday was suspected of purchasing cocaine from a supplier in the New York City area.  Based on the detailed observations presented in the affidavit and on Tamuleviz's representation that other investigative techniques had been (or would be) unsuccessful, a wiretap warrant issued for Target Telephone #1 on May 27, 2008.

On June 25, 2008, Tamuleviz applied for and received authorization to continue monitoring Target Telephone #1.  In his affidavit in support of that application he stated that monitoring of Target Telephone #1 had revealed that Urday was buying drugs from a local supplier referred to as "Tato."

### 2. Target Telephone #2

On July 8, 2008, Tamuleviz applied for and received authorization to monitor Target Telephone #2, which was believed to be used by Urday's drug supplier, known to law enforcement only as Tato.  In his affidavit in support (which incorporated his previous affidavits), Tamuleviz stated that monitoring of Target Telephone #1 had revealed a number of calls to Target Telephone #2 and that the content of those calls suggested that

the user of Target Telephone #2 was supplying drugs to Urday.

For example, the affidavit stated that on May 31, 2008, Urday placed a call to Tato on Target Telephone #2 and asked "Is there meat to sell?" Tato responded "yeah" and the two arranged to meet at Urday's house later that day. Based on his training and experience, Tamuleviz concluded that Urday was using "meat" as a code word for cocaine and that the call was consistent with a low-level cocaine distributor "ordering up" from his source of supply. Tamuleviz had previously heard Urday use coded language to refer to drugs when arranging a controlled buy with an informant.

On June 13, 2008, Urday received a call on Target Telephone #1 from Target Telephone #2. In that call Urday stated "I need two tennis balls, can you bring them down for me tomorrow?" Tato responded that he would send "Walter" to Urday's house the following morning. Based on that call law enforcement agents set up surveillance at Urday's house. The next morning Tato called Urday from Target Telephone #2 and informed Urday that "the guy is going to be there in like ten minutes" to which Urday responded "Yeah, everything is set. Ask him to knock on the back door."

Shortly after that call agents observed a vehicle registered to Felix Serrano drive up at Urday's house. A man got out of the passenger seat, went around the back of the house and emerged

with Urday a few minutes later before getting back in the car to leave. Agents followed the car and arranged for a traffic stop by the Massachusetts State Police. Although a search of the car revealed no drugs, police did discover $1,000 in cash on the occupants and learned that the passenger, Victor M. Rosado Vazques ("Rosado Vazques"), was then under indictment in Plymouth County Superior Court for trafficking in cocaine. Tamuleviz also concluded that Rosado Vazques was the "Walter" referred to by Tato and was acting as Tato's cocaine courier.

Several calls later that month also led Tamuleviz to conclude that Tato was supplying drugs to Urday. On June 26 and 28, 2008, Urday, using Target Telephone #1, called Target Telephone #2 and discussed with Tato whether his "friends" had arrived yet and arranged to have "it" delivered to Urday's house. Police also intercepted a call made to Target Telephone #1 on June 28, 2008, from Walter in which Urday instructed Walter to "go to the back of the house where the red shed is, the padlock is open, put it in there to the side" and told Walter that he would give Tato the money the next day. On that same day Tato called Urday using Target Telephone #2 and had a conversation about giving him money.

As a result of the intercepted calls between Tato and Urday, the government subpoenaed toll records for, and obtained a court-authorized pen register on, Target Telephone #2. Those records

revealed that Target Telephone #2 had been used to make numerous calls to a telephone being used by Walter (identified as Ramon Vasquez) and two calls to James Ramirez, who was then under active investigation for dealing cocaine.

In addition to discussing those observations, Tamuleviz's affidavit further described why normal investigative techniques had failed or would not be useful.  In particular, the affidavit noted, that despite the investigation of Urday (and the intercepted calls on Target Telephone #1), law enforcement had been unable to ascertain the true identity of Tato. Consequently, physical surveillance and other traditional forms of investigation were not possible.  Moreover the physical surveillance of Urday proved insufficient because he conducted transactions out of the sight of agents.

### 3. Target Telephone #3

On July 29, 2008, Tamuleviz applied for and received authorization to monitor Target Telephone #3, which was also used by Tato.  In his affidavit in support of the application (which incorporated by reference his previous affidavits) Tamuleviz stated that on July 10, 2008, shortly after the authorization to monitor Target Telephone #2, Tato called Urday from Target Telephone #3 and stated "Hey Carlos, this is Tato's new number" and "It's the new number, I changed the number."  Immediately after that call Urday called Target Telephone #3 and, after Tato

answered, said "Yeah, I just wanted to be sure that this was the number." In calls from Target Telephone #2 to other numbers Tato stated "I'm going to call you from another number, I changed it." He would then immediately call from Target Telephone #3 (according to the pen register for that number).

Over the course of the next few days agents intercepted several calls between Urday and Target Telephone #3 which Special Agent Tamuleviz believed concerned drug deliveries and payments. For example, during one call on July 15, 2008, Urday said to Tato "Tomorrow when you send to collect the money that I have to send you . . . Send me a little ball. I need a little ball."

As with his July 8, 2008, application, Tamuleviz's affidavit detailed why traditional forms of surveillance had been, and would likely continue to be, unable to uncover the full scope of the drug conspiracy.

### 4.   Search Warrants

Through the monitoring of Target Telephones #2 and #3, DEA agents learned that Tato is the defendant Felix Serrano. On August 22, 2008, Special Agent Tamuleviz sought and obtained warrants to search Serrano's residence located at 93 Draper Street, Dorchester, Massachusetts, and another property, 43 Dana Avenue, Hyde Park, Massachusetts, which agents suspected was being used to stash drugs. Tamuleviz's affidavit in support of both warrants included substantive information obtained from the

monitoring of Target Telephones #2 and #3.

That information included conversations in which Serrano instructed a suspected supplier to "pass by and pick up some garbage" at the big, three-story house and calls in which he instructed that individual that he was "at number 93." Physical surveillance of 93 Draper Street revealed individuals arriving at that address at the appointed times.

Intercepted calls and physical surveillance also led agents to believe that 43 Dana Avenue was being used as a stash house referred to by Serrano and his associates as "the little cave." For example, agents intercepted calls in which Serrano agreed to send a "little motorcycle" to an unidentified male. Tamuleviz surmised that a "little motorcycle" was code for cocaine. Following that call, agents observed one of Serrano's suspected couriers, the defendant Arnaldo Castro ("Castro"), also known as "Eano," leave 93 Draper Street and drive to 43 Dana Avenue. Soon after arriving, Castro was called by Serrano and given detailed instructions on how to put "it" inside a "bag . . . so the white color doesn't show."

In another telephone call, which occurred shortly after one of Serrano's couriers had been stopped by police, Serrano instructed Castro to pack up stuff from the little cave and bring it to 93 Draper Street. Following that call agents observed Castro arrive at Draper Street and carry three large black trash

bags into Serrano's residence.

Based on the statements in Tamuleviz's affidavit, warrants were issued for both 93 Draper Street and 43 Dana Avenue. Searches of both addresses resulted in the seizure of large quantities of drugs and other evidence of drug trafficking.

**B.   Procedural History**

The defendants were named in a sealed criminal complaint on August 22, 2008, and arrested on September 2, 2008.  An indictment was handed down on October 1, 2008, and was followed by a superseding indictment on December 17, 2008.

On February 18, 2009, the defendant Serrano filed the pending motion to suppress wiretap evidence and physical evidence seized during subsequent searches.  The defendant Urday moved to join that motion on February 25, 2009.  On March 9, 2009, Judge Woodlock referred the motion for random assignment to another district judge and it was subsequently assigned to this session. On that same day the government filed an opposition and the defendant Castro filed a motion to join in the motion to suppress.

**II.   Analysis**

**A.   Wiretap Standard**

Before authorizing the interception of wire communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1986 ("Title III"), 18 U.S.C. §§ 2510-2522, a

court must find probable cause and necessity.  See 18 U.S.C. § 2518; United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003).  To show sufficient probable cause an affidavit in support of a wiretap application must demonstrate 1) probable cause to believe that "an individual is committing, has committed, or is about to commit" a criminal offense and 2) probable cause to believe that "communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a)-(b).  A finding of probable cause must be sustained if the facts set forth in the affidavit were "minimally adequate to support the determination that was made."  Santana, 342 F.3d at 65 (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003)).

With respect to necessity, Title III requires that a wiretap application include

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c).  To satisfy that requirement the government make a "reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987).  A reviewing court must uphold a wiretap if "the facts [in the affidavit] are reasonably adequate to support the issuing judge's

implicit determination that other procedures reasonably appear to be unlikely to succeed." United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989).

### B.   Search Warrant Standard

A search warrant application must demonstrate probable cause to believe that 1) a crime has been committed (the commission element) and 2) particular evidence of the offense will be found at the place to be searched (the nexus element). United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found at a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A prior judicial determination of probable cause is entitled to great deference by the reviewing court. Id. In considering the sufficiency of an affidavit, a court must determine whether the "totality of the circumstances" presented demonstrate probable cause. United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003).

### C.   Application

The defendants contend that the authorizations for electronic monitoring of Target Telephones #2 and #3 were not supported by a showing of probable cause or a showing of necessity. Consequently, they argue, evidence obtained pursuant to those wiretaps and all derivative evidence, including items seized pursuant to the search warrants, must be suppressed.

### 1.   **Probable Cause**

The defendants assert that the authorizations to monitor Target Telephones #2 and #3 were based solely on Special Agent Tamuleviz's questionable interpretation of certain words as being code for cocaine. A review of the affidavits, however, reveals ample probable cause to believe that both telephone numbers were being used in connection with criminal activity.

Tamuleviz's belief that the terms "meat" and "tennis balls" were used as code words for cocaine was more than a mere hunch. Tamuleviz had 17 years of experience with drug investigations and had learned that drug traffickers often speak in coded language. More importantly, he knew from his involvement in this investigation that the defendant Urday regularly used code when discussing drugs over the telephone. His conclusion that calls made to Target Telephone #2 involved the ordering of drugs was thus eminently reasonable.

Furthermore, the belief that Urday was calling Target Telephone #2 to purchase drugs was corroborated by physical surveillance. On one occasion police observed two men arrive at Urday's house on the morning after Urday arranged to have "two tennis balls" delivered from Serrano. One of the two went around the back of the house just as Urday had discussed the day before in his call with Serrano. Although police found no drugs during a subsequent traffic stop of those men, they did find $1,000 in

cash in their possession and ascertained that one of the men was then under indictment for drug trafficking.

With respect to Target Telephone #3, agents intercepted several telephone calls in which Serrano stated that he had changed his number and that Target Telephone #3 was his "new number." They also intercepted calls from Urday to that number which involved coded conversations about drugs. Thus, whatever probable cause existed with respect to Target Telephone #2 applied equally to Target Telephone #3.

The foregoing facts are more than "minimally adequate" to support a finding of probable cause with respect to the wiretaps on Target Telephones #2 and #3. See Santana, 342 F.3d at 65.

**2. Necessity**

The defendants challenge the government's showing of necessity by asserting that Tamuleviz's affidavits contains mere boilerplate allegations of necessity with little or no relationship to the facts in this case. Once again, however, a review of the affidavits themselves indicates otherwise. Special Agent Tamuleviz's statement of necessity (which is substantially similar in both affidavits) was lengthy and fact specific. It detailed why nine alternative investigative techniques could not be used in this case or had proven fruitless. The fact that many of the limitations identified are common to most drug investigations is irrelevant. United States v. Martinez, 452

F.3d 1, 5-6 (1st Cir. 2006) ("Necessity is a function of the specifics of the case, not its uniqueness.").

A major obstacle to most forms of traditional investigation was the fact that law enforcement had been unable to ascertain Tato's identity. Without knowing the identity of the target, physical surveillance, trash pulls, search warrants and undercover buys were almost impossible.

Numerous investigative techniques were used in connection with the investigation of Urday (including a wiretap of his telephone). Despite the use of those techniques for over a year, however, law enforcement had only limited success in uncovering other participants in the drug trafficking conspiracy and had failed to ascertain the identity of Urday's supplier or suppliers. Consequently, the statements of necessity with respect to both Target Telephones #2 and #3 were adequate under Title III. See 18 U.S.C. § 2518(1)(c).

### 3.  Search Warrants

Having determined that the wiretaps were lawful there is little left to the defendants' contention that evidence obtained pursuant to the search warrants must be suppressed. Indeed, it is unclear whether the defendants' argument with respect to the search warrants is entirely dependent on the Court first finding that the wiretaps were unlawful. Nevertheless, because Serrano's memorandum suggests that "[w]ith or without the statements

-14-

gleaned from the illegal wiretaps," the search warrants failed to establish a nexus between illegal activity and the properties searched, the Court will treat it as an independent argument.

The affidavits submitted in support of the search warrants for 93 Draper Street and 43 Dana Avenue expose a plethora of facts from which the magistrate could reasonably conclude that those properties were being used in connection with drug activity.  With respect to 93 Draper Street (Serrano's residence), agents intercepted telephone calls in which Serrano directed his suspected drug supplier to come by 93 Draper Street to "pick up some garbage."  Moreover, given the substantial evidence of Serrano's drug trafficking gleaned from intercepted calls, it was incontestably reasonable to suspect that evidence of such trafficking would be found in his home.  See United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999) (noting that it was "reasonable to suppose that [a long-time, successful drug trafficker] kept the money he collected and used in his business in some safe yet accessible place").

With respect to 43 Dana Avenue, Hyde Park, or "the little cave," surveillance of that address and monitoring of Serrano's telephone clearly suggested that drugs were being stored inside. For example, police observed the defendant Castro going to that address immediately prior to delivering drugs to customers. Furthermore, in one intercepted conversation, Serrano, apparently

-15-

concerned about law enforcement, directed Castro to pack up stuff at the little cave and bring it to 93 Draper Street, Dorchester. Police subsequently observed Castro arriving at Draper Street with three large trash bags.

In sum, the affidavits provided ample probable cause to believe that both the Hyde Park and Dorchester addresses were being used in connection with drug trafficking and, therefore, the evidence seized pursuant to those warrants will not be suppressed.

**ORDER**

In accordance with the foregoing, the defendants' motions to join (Docket Nos. 47 and 54) are **ALLOWED** but the defendant Serrano's motion to suppress (Docket No. 40) is **DENIED**.

**So ordered.**

                                                /s/ Nathaniel M. Gorton  
                                              Nathaniel M. Gorton  
                                              United States District Judge  
Dated June 25, 2009